**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00133-CR**
_____

**TIMOTHY JARVIS COOLEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-06-07657-CR**

_____

**MEMORANDUM OPINION**

Appellant Timothy Jarvis Cooley ("Cooley" or "Appellant") appeals his conviction for the offense of continuous sexual abuse of a child, a first-degree felony punishable by five to ninety-nine years or life imprisonment and a fine not exceeding $10,000. *See* Tex. Penal Code Ann. §§ 12.32, 21.02(b). In five issues, Cooley complains that the trial court erred in dismissing a juror and in certain evidentiary rulings. For the reasons explained below, we affirm the trial court's judgment.

1

# BACKGROUND

A grand jury indicted Cooley for the offense of continuous sexual abuse of a child, alleging Cooley:

> did then and there, during a period that was 30 or more days in duration, to-wit: from on or about October 7, 2014 through December 31, 2018, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [Eva],[1] a child younger than 14 years of age, namely Sexual Assault of a Child by intentionally or knowingly penetrating the sexual organ of [Eva], a child, with Defendant's sexual organ and Indecency with a Child, by causing [Eva], a child, to engage in sexual contact with intent to arouse or gratify the sexual desire of Defendant, by touching [Eva's] body with Defendant's sexual organ[.]

*See id.* § 21.02(b), (c)(2), (4); *see also id.* §§ 21.11(a)(1), 22.021(a)(1)(B)(i), (iii).

The trial was to the jury for both guilt-innocence and punishment. After the jury convicted Cooley of the offense charged and assessed punishment at life, the trial court sentenced Cooley to life imprisonment. We summarize the evidence below .

## Detective Michael Lee's Testimony

Detective Lee ("Lee") testified to his experience in law enforcement, recalling that he became a detective in 2017, and as of the time of trial, he was in his thirteenth

---

[1] We use pseudonyms to refer to the victims, including the complainant, a minor, and we refer to her family members other than Cooley by their relationship to the victim to protect the victim's privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process"). In other instances, we refer to witnesses by their first names, only, to protect their privacy.

year of working with the Montgomery County Sheriff's Office. For the previous five years, Lee was assigned to the Special Victims Unit of the Criminal Investigations Division, a unit "tasked with the job of investigating the most serious crimes of sexual and physical abuse" of children. Lee testified that he had more than 3,300 hours of continuing education credits applicable to his position, with topics including "the multidisciplinary team process in child advocacy centers, childhood trauma[] and its effects and presentation in child sexual abuse cases[,] [t]he effects of trauma on children behaviorally, child cognitive and sexual development, [and] assessing the outcries of abuse from children[.]" Lee is also president of the National Crimes Against Children Investigators Association ("Investigators Association") and is listed as an expert resource by the Institute for Domestic Violence and Sexual Assault ("IDVSA"). He described the Investigators Association as "an organization that specializes in providing training to police officers, prosecutors," social workers, and other professionals who form a "multidisciplinary team for children's advocacy centers." According to Lee, the Investigators Association also provides resources to agencies that lack them and provides community outreach such as advocacy education awareness for parents and communities. Lee has developed and taught some of these classes, such as classes for the Texas Forensic Nurse Examiner.

Lee testified that during his time in the Special Victims Unit, he handled "several hundred" physical or sexual cases and has consulted on thousands of other

3

such cases. When consulting on a case, Lee would obtain basic information about the allegations and the investigative steps already taken. He would then provide resources or suggestions about how to proceed with the case. Lee has testified as an expert many times, addressing such topics as investigating child physical abuse, child sexual abuse, and sexual exploitation of children.

Lee's office is located at the Children's Advocacy Center in Conroe, which serves Montgomery, Walker, and San Jacinto Counties. The multidisciplinary team, of which Lee is a member, is also located at the center, as are "all manner of different professionals" such as CPS workers and forensic interviewers.

Specifically referencing the instant case, Lee testified that he was assigned to the case as the primary detective in late January 2019. At that time, Lee learned that personnel had already conducted a forensic interview with Eva. He described a forensic interview as "an interview that is conducted in a trauma-informed and child-friendly environment by a trained professional[]" whose "specialty is talking to children in the context of these types of cases." Lee believed Eva's interview was conducted on January 24, 2019, when Eva was eleven years old and in the fifth grade. Lee agreed that a parent's intentional or accidental manipulation of a child can be a concern, and that is why it is important for forensic interviewers to be neutral, without suggesting the information sought. Lee saw evidence that Cooley had influenced Eva but saw no indication that Mother or Stepfather had done so.

4

When Lee later viewed the interview, as he does on every case, he was looking for content, context, and corroborative information. He explained content and context as evaluating whether "the story from the child makes sense within the context that I understand that these things can happen." Lee also explained "outcry" as a child's disclosure of abuse and noted that "most of the cases that we get involve a delayed disclosure from the child." When asked whether it would be common or uncommon to get every detail about the abuse during the initial forensic interview, Lee further noted that "it's uncommon to get all of the story in the beginning[]" and recalled that Eva gave her descriptions of Cooley's offenses, which escalated from improper touching to sexual penetration, "after some further disclosures" that probably occurred "several months afterwards."

After watching Eva's forensic interview, Lee spoke to Mother and arranged for Eva to undergo a SANE examination.[2] Since it had been over 120 hours since Eva was assaulted, she underwent a non-acute examination, which would assess any injuries or a latent sexually transmitted infection but would not involve collecting evidence. Eva's SANE examination revealed no vaginal injuries. As part of his investigation, Lee sought additional records so he could have "informed conversations[]" when he started speaking to people. These records would generally include CPS records, school records, counseling and medical records, "[a]nd

_____

[2] SANE stands for Sexual Assault Nurse Examination.

anything else that could, again, help me identify timeline, information, other witnesses that I need to talk to, and any other relevant information that anybody has referenced or that we might need for investigation." He testified that CPS records are important because they typically contain information from a concurrent CPS investigation. School records enable Lee to "assess [] the developmental capacity of the child[]" and would also document a child's special needs, if any. School records also contain information regarding the child's teachers, counselors, and nurses, so that Lee can interview these individuals, as well. These records help Lee understand "the family dynamics."

During his investigation, Lee obtained Eva's CPS, school, counseling, and medical records. He also obtained court records of Cooley's and Mother's divorce. He learned that Mother and Cooley had a custody dispute over Eva, but that dispute was resolved by the time of Lee's investigation. Lee also spoke with Cooley's and Eva's current and former friends, family members, and mental health professionals to gain additional information. In particular, he interviewed Cooley's former wives and girlfriends and consulted a law enforcement database to research Cooley. Although Lee attempted to speak with Cooley and Cooley's then current wife, he was unable to do so. Lee described his approach to an investigation stating that, before interviewing a suspect, "ideally, I would like to know absolutely everything[]" but defined the bare minimum of an effective interview as including

6

the child's and caregiver's interview so as to "understand the landscape and family dynamics and the child's behaviors and how the outcry came out and things of that nature."

Lee acknowledged that it is not necessarily abnormal for a child to speak about or exhibit some type of sexual activity at a young age and he was aware that Eva allegedly had viewed pay-per-view pornography in Mother's home. Lee additionally learned that Eva exhibited anger issues at the time Mother and Stepfather married. The information Lee gained during his investigation, along with his training and experience, led him to conclude that Cooley should be arrested for continuous sexual abuse of Eva, a young child.

Julie Pilgrim's Testimony

Julie Pilgrim ("Pilgrim") testified that in January 2019, she was a forensic interviewer at Children's Safe Harbor, a child advocacy center in Conroe. As a forensic interviewer, Pilgrim interviewed children from ages two to seventeen, as well as adults with disabilities. The interview subjects may be victims of physical abuse, sexual abuse, or witnesses to violence.

Pilgrim described the process of becoming a forensic interviewer, which first involves learning the basic interview process and completing two mock interviews. The process then goes into more depth, addressing physical abuse and witnessing violence, before "consider[ing] essential issues in forensic interviewing and

preparing for court." This third stage of training "goes over things like memory, trauma, suggestibility and things like that." She and her colleagues on the forensic interview team also regularly watch and discuss each other's interviews.

According to Pilgrim, the purpose of a forensic interview is to reduce the number of times and places a child needs to relate his or her experience and "to gather information about something a child may have witnessed or experienced." Conducting a forensic interview also reduces suggestibility, because the interviewer is trained to ask questions "in a nonleading, neutral manner." Pilgrim also confirmed Lee's testimony about the purpose and function of children's advocacy centers and Children's Safe Harbor in particular, as well as the nature and stages of disclosure. Pilgrim estimated that she had conducted approximately 1,800 forensic interviews.

Pilgrim described the structure of a forensic interview procedure as beginning with preparation, which may include a report from law enforcement or CPS. This report gives the interviewer "a basic understanding" of the situation before she talks to the child but does not alter the way Pilgrim conducts an interview. CPS or law enforcement personnel remotely observes the interview through closed-circuit television. The interview, itself, begins with explaining the room, including the cameras, to the child. The interview then moves to rapport building, when the interviewer "establish[es] comfort with the child[,]" gets to know the child and assesses the child's developmental stage. The interview then moves through the rules

8

and truth/lie oath stages, the introduction to the topic of concern, the detail gathering and the closing. In the rules section of the interview, Pilgrim lets the child know the importance of telling the truth, not guessing about unknown information, and correcting the interviewer if necessary. Pilgrim noted that setting these rules reduces suggestibility. During the next stage of the interview, the interviewer asks the child what he or she is there to talk about and lets the child respond. To conclude the interview, after gathering "all the details that I feel were needed or that I could[,]" Pilgrim would exit the room to consult with the observer(s) about possible additional questions. Pilgrim then speaks again with the child, "bringing it back to a neutral topic," before thanking the child for coming and escorting the child to the "front." Pilgrim also asks children she interviews about an "alternative hypothesis," meaning abuse or abusers other than the specific subject matter of the outcry and discusses body safety with them. Pilgrim followed these steps in conducting Eva's January 24, 2019 forensic interview, during which Eva identified Cooley as her abuser.

Pilgrim testified that during the rapport building phase of Eva's interview, Eva was "very engaged" and "talkative[,]" but became "more hesitant" later, and was concerned that something might happen to Cooley.

Eva's Testimony

Eva was fifteen years old at the time of trial. Eva testified about the houses where the abuse occurred. She referred to Cooley's previous residence as "Gammy's

house," even though Eva's grandmother passed away when Eva was very young. Eva recalled visiting Cooley at Gammy's house when she was six years old. Eva explained she had her own bedroom there, and did not recall why she usually slept in Cooley's bedroom.

Eva described Cooley's house as being yellow, with brick on the side, at the time she visited Cooley there. She also explained where the various rooms were located with reference to the windows shown on the photograph of the home's exterior.

Eva then recalled some of the things she did while visiting Cooley, including going to church, picking fruit, cooking, woodworking, camping, fishing, and riding horses. She recalled that she did not disclose the sexual abuse to her Mother until after the custody battle.

Eva testified that the first time Cooley did something that made Eva uncomfortable, she was seven years old. At the time, they were at Gammy's house. They were lying on Cooley's bed with the front of Cooley's body against the back of Eva's body. She felt his penis "up against [her] butt[]" and felt him moving "back-and-forth." She indicated that this encounter took place "through clothing[,]" and that it felt "really uncomfortable[,]" that she "didn't know what was happening[,]" and was "really scared." Afterward, Cooley threatened Eva by "chas[ing] [her] around the house with a knife and saying if [she] told anyone, [he] would kill [her]

10

and [her] family." Cooley's threat frightened Eva, so she did not tell anyone what had happened. In another incident at Gammy's house, Eva explained that Cooley first put "his private part . . . into my private parts." At the time, Eva was "[s]cared[,]" and "didn't know what – really what [she] was supposed to do."

At a different house where Eva visited Cooley (the "Magnolia house"), Eva had her own room, but she slept in Cooley's bedroom because he told her there were monsters under her bed. Eva testified that Cooley sexually assaulted her at the Magnolia house. Eva remembered being "[v]ery scared[]" and "[u]ncomfortable[]" during the assault and recalled that he was moving "back and forth." As with the prior encounter, Eva did not understand what was happening and was "[v]ery weirded out[]" by it. Cooley told Eva "not to tell anybody[]" about what he had done.

The day after the above-described assault, Cooley and Eva were in the garage when he hit her on the leg with a hammer, stating that it was Eva's fault that Cooley and his then girlfriend had ended their relationship. The hammer left a "big bruise" on Eva's leg, and Cooley's statement about the breakup made her feel guilty, although Cooley never explained why he blamed Eva for the breakup. Eva testified that Cooley told her to explain the bruise by saying that a falling piece of plywood caused it; although Eva did so, she felt bad for lying about it. Approximately a year or two before trial, Mother looked at a photograph of the bruise on Eva's leg and

challenged Eva's explanation about the cause of the bruise. Eva then told Mother that Cooley had hit her with a hammer.

Eva testified that while Cooley was married or in a dating relationship, he did nothing to make Eva feel uncomfortable, but when a relationship ended, the sexual abuse occurred. Eva expressly mentioned women named Linda and Gail and testified that Cooley did nothing to her while he was in a relationship with them, but that after these relationships ended, he sexually assaulted Eva. Eva also mentioned a woman he dated after ending his relationship with Gail, and Eva testified that Cooley did not assault her during the two weeks he was seeing this woman. After that breakup, Cooley began seeing Debra, his wife at the time of trial. Eva testified that the last time Cooley assaulted her was after he stopped seeing Gail but before he began dating his subsequent girlfriend, whose name Eva could not recall.

Eva eventually told Mother about Cooley's assaults and asked Mother not to tell anyone that she and Cooley were "sleeping in the same bed[.]" Eva eventually told Mother more about the abuse, but she did not share this information "all at once." When telling Mother what had happened, Eva was "[v]ery shy about it, very scared to tell her[,]" because she was afraid that Mother would judge her. Eva explained that instead of being judgmental, Mother was "really sad[]" to hear Eva's disclosure and started to cry. Mother's reaction made Eva "[r]eally sad[,]" but she also was relieved that she "didn't have to talk about it anymore."

12

When asked about her interview at Safe Harbor, Eva believed that she told her interviewer some of the things Cooley did. She denied that anyone told her what to say or that she had a reason for withholding any information during her interview. At Safe Harbor, Eva received counseling "to help [her] talk about things that [she was] uncomfortable talking about." She thought she told the counselor what Cooley did to her. Eva also explained that when she was six or seven years old, Cooley hit her on her arm and face and left bruises. Although Mother saw the bruises, Eva did not tell Mother what had happened.

Eva acknowledged taking medication for her mental health, starting when she was about ten years old. She was unsure of her diagnoses, but thought doctors had diagnosed her with autism, ADHD or ADD, and other things she could not remember. Eva did not recall the details of her medications, except that Mother and Cooley disagreed about her taking them, and she testified that she took more than three pills per day at the time of trial. Eva acknowledged having falsely accused Stepfather of kicking her and punching her in the face when she was in the fourth or fifth grade, and she testified that she had admitted the allegations against Stepfather were false shortly afterward. Eva further admitted having falsely accused Stepfather of trying to drug her "[b]ecause [she] was very angry at him[,]" but she denied that she made-up accusations against people when she got upset.

When asked on cross-examination whether she hallucinated about people that were not there, Eva testified that Isabel "was a side of me when I was going through a really rough time[,]" and Eva called Isabel "mean[,]" but stated that Isabel did not try to get Eva to do anything she did not want to do. When Eva was dealing with Isabel, she was between fifth and sixth grades, and Eva's prescribed medication "got rid of her[.]" Eva also acknowledged having hurt herself to try to get out of doing things but explained that she had not done so "in a very long time[,]" and that her prescribed medication helped her "deal with anxiety and stuff." Eva gave an example of overdosing on Mucinex because she was "[v]ery stressed and just couldn't deal with life anymore." She also started a fire in her bedroom when she was playing with a lighter and accidentally dropped it onto her bed.

Eva testified that she did not like any of the mental health professionals she saw. She "[k]ind of[]" remembered that she did not like Dr. Brown, who placed Eva in Meridell Achievement Center for six weeks but acknowledged that Meridell helped her a lot.[3]

---

[3] According to the testimony of Lauren Hollis, which is summarized below, Meridell Achievement Center is a residential treatment facility where "they work on behaviors and symptoms and help you achieve the best you can with your mental health, as well as health and wellness."

Casey Weary's Testimony

Casey Weary ("Weary") testified that she is a registered nurse at Texas Children's Hospital, where she is the Nurse Manager for the hospital's Public Health Pediatric Team, which is the team for child abuse and negligence. She is also the Sexual Assault Nurse Examiner ("SANE"). Weary manages the day-to-day clinic operations and in early 2019, she performed medical examinations at Children's Safe Harbor.

Weary described the process of becoming a SANE, noting that it required about sixty-four classroom hours and nearly 100 clinical hours learning the techniques and performing this type of examination. She estimated that she has performed hundreds of sexual assault examinations of children during the ten years that she has been qualified to do so.

In describing the process for conducting a SANE examination, Weary testified that she begins with talking to the child and "building a rapport." This conversation enables her to assess the child's level of understanding so that she can then explain telling the truth versus a lie in a manner appropriate to the child's developmental level. She then asks the child to "tell me a little bit of why you are here today[]" to open a dialogue with the child. The examiner then obtains a detailed medical history. In Eva's case, the medical history included not only the ADHD diagnosis Eva previously mentioned, but bipolar and conduct disorder, as well as use of the

15

medications Concerta, Abilify, Trazodone, Lexapro, and Topamax. Eva's medical history also included a history of bedwetting while visiting Cooley and frequent nightmares, but she did not recall any symptoms such as anger, legal trouble, animal abuse, or suicidal ideation.

The examination procedure then moves to the head-to-toe physical examination, paying special attention to the genitalia and "looking for any signs of injury or any additional abnormality[.]" Weary testified that it is important to perform an examination even if time has passed since the assault, as the examination may identify an infection or other disease process that may not be readily apparent. The child is permitted to choose whether the parent or other caregiver remains in the room during the examination, and if anyone beside the child and the nurse is present, it usually will be noted in the record.

Weary conducted Eva's examination at Children's Safe Harbor in February 2019. During that examination, Weary established Eva had an understanding of the difference between the truth and a lie, and she obtained Eva's medical history, including her description of the abuse. Specifically, Eva told Weary that Cooley had sexually assaulted her when she "could feel his penis in my butt." Weary then asked Eva some follow-up questions about this incident, and Eva related that she was six or seven years old the first time Cooley touched her and that during the assault, she was wearing underwear and nightclothes, and Cooley was wearing underwear.

16

Weary's physical examination of Eva yielded normal results and showed no physical signs of injury, which neither confirms nor eliminates the possibility of sexual abuse. Weary was not surprised by the absence of signs of injury, since this type of tissue "can heal very rapidly." She also testified that a delayed outcry is "very common."

Lauren Hollis's Testimony

Lauren Hollis ("Hollis") testified that she is a Licensed Professional Counselor. She described her training and experience, noting that she has a bachelor's degree in psychology from the University of Oklahoma and a master's degree in clinical mental health counseling from Sam Houston State University. She also completed a 3,000-hour internship at Children's Safe Harbor and is now in private practice. While Hollis worked at Children's Safe Harbor, she provided counseling services, which are free to children and families that come through the advocacy center. She is a member of professional organizations and maintains her license by remaining current with continuing education and testing requirements.

Hollis explained the goal of counseling is to help the client heal from trauma and be less distressed when talking about a traumatic experience so the client can learn to live with the experience without it being overly distressing. During therapy, Hollis asks questions but does not require her clients to respond if they prefer not to. When her client chooses not to discuss the abuse, Hollis focuses on coping skills and emotional regulation and identification, so that the client has the skills to talk about

the abuse if and when ready to do so in the future. She testified that trauma does not look the same in every child, but symptoms of trauma include behavioral regression or changes, nightmares, bedwetting, and withdrawal from normal activities. Hollis further noted that it is common for abuse victims to disclose the abuse in stages as they "grow coping skills and learn to express themselves[.]"

In describing the therapy process, Hollis testified that the assigned counselor first meets with the child's caregiver to obtain background information about family, medical history, and related information. This meeting with the caregiver alone is important because it informs the counselor about the parenting style and the child's symptoms. After meeting with the caregiver, the counselor meets with the child to get to know the child before scheduling regular therapy sessions. Hollis followed this approach by visiting with Eva's caregiver, Mother.

During Mother's interview with Hollis, Mother described their living situation and Eva's symptoms and advised that Eva was referred to counseling due to Cooley's alleged sexual abuse. Eva's symptoms, as Mother listed them included insomnia, harming animals, hallucinations, stealing, bed-wetting, lying, increased sexual curiosity, and another side of Eva called "Isabella[,]" among other symptoms.

When Hollis later interviewed Eva, Hollis noted that Eva reported having suicidal ideations, lying, and being bullied at school. Eva also conceded that she had lied about Stepfather's alleged physical abuse and her threats against him, stating "I

18

don't really want to hurt him." Hollis's notes described Eva's statements about the abuse as follows:

> Client [Eva] became tearful and began shaking. Counselor engaged client in deep breathing exercises. Client engaged and verbalized needing to tell counselor something, but was afraid that counselor would tell her mom and detective. Counselor listened and discussed the importance of telling information that is worrying client and went over limits of confidentiality again. Client verbalized, '[Cooley] raped me.' Counsel asked client to clarify what 'rape' meant. Client stated: '[Cooley] had sex with me.' Counselor, again, asked client to clarify what 'sex' meant to client. Client did not want to say the words, but pointed to pictures. Client pointed to a picture [of] a male's genitals and stated, 'His went into mine,' while she pointed to the female's genitals. Counselor asked for clarifying names that client was pointing to. Client stated: 'His penis went in my vagina.' Client was tearful and verbalized concerns she would get in trouble or that people would be mad she didn't tell this information during the forensic interview. Client stated she was scared of [Cooley] because he made threats that he would search for her if she told. Counselor normalized client's concerns and explained that client would not be in trouble and had courage for telling counselor. Counselor and client discussed how to tell caregiver about new disclosure.

According to Hollis's notes, she brought Mother back into the counseling session to tell Mother the full extent of Cooley's assault, and Mother was supportive, reassuring Eva that she was not in trouble. Eva then stopped crying and shaking and stated that she felt better that she finally told someone. Later that day, Hollis reported Eva's new disclosure to Detective Lee, as legally required. Since Eva was about to enter inpatient treatment, Hollis did not consider it appropriate to continue with these counseling sessions, and discharged Eva to go to Meridell Achievement Center.

19

During cross-examination, Hollis acknowledged that she had no way to determine whether Mother and Eva were providing accurate information, but instead she had to assume that the information they provided was correct. Hollis also agreed that the diagnoses Weary referenced, ADHD, bipolar disorder, conduct disorder, and borderline personality disorder, "all can be very serious."

Dr. Danielle Madera's Testimony

Dr. Madera ("Madera") testified that she is a clinical psychologist. She set out her educational and professional qualifications, which include an undergraduate degree in psychology, followed by master's and doctoral degrees in the same field. At the time of trial, Madera was the clinical director at the Harris County Juvenile Probation Department, but formerly worked at the Children's Assessment Center in Harris County, which is an advocacy center for sexually abused children. In the past, Madera also has worked as forensic interviewer and a CPS worker, and has "done many community trainings for different groups on the subject of child sexual abuse, forensic interviewing, extended assessments and human trafficking." Madera has approximately twenty years of experience working with sexually abused children and estimated that she has testified as an expert on the dynamics of child sexual abuse at least fifty times.

Madera confirmed that a child often delays a disclosure of sexual abuse and that when the child does disclose, she may make a partial disclosure to "feel out"

20

whether people will believe and support them. According to Madera, many factors can affect the disclosure, including the child's age and gender, as well as the family dynamics. To illustrate her point, Madera noted that a very young child with no understanding of sex may "have no language for what's happening to them. They don't know how to communicate it." She further testified that fear affects disclosure, as does trust in the caregiver or other person to whom the child discloses. She stated that it would be common for a child who is getting support to disclose more information over time.

When asked about a child's ability to recall details of long-term sexual abuse, Madera testified that "the idea that a child should be able to tell every sort of detail when it's something happening regularly, it is not reality. The kids are going to remember different factors based on their age, cognitive ability, their maturity." She elaborated on this concept, explaining that

> [i]t's easier to encode memory when you have a basis for it. So, if something happens to you that you understand because it's happened before, it's easier to make sense of it. When it's new, it's harder to encode and remember. For younger children, sensory experiences stand out. So, they may, without even having a narrative memory, understand smell, touch, that sort of thinking. That's going to stand out to them, and over time, they could regain extra memories as they are triggered by the senses and as they have more of an understanding of what's happened to them. It also can come back in nightmares and flashbacks and things of that nature, depending on the age of the child.

She likened expecting a child to recall every detail of ongoing sexual abuse to trying to remember every dinner one had eaten for the last thirty days, stating "it's not likely that anybody would remember that."

Although Madera has never met Eva or her family members, she reviewed Eva's records from Brownstone Psychiatry, Intracare, Meridell Achievement Center, SUN Behavioral, Children's Safe Harbor, Eva's school, the SANE examination, the forensic interview, and the law enforcement incident report. Her review of these records indicated to her that Eva disclosed Cooley's abuse gradually and "felt out the family reaction, and over[]time, when she was in counseling or hospitalized that she was able to put more words to her experience and disclose more details."

Madera also testified about grooming, defining it as "any action taken with the idea of building trust with that child and lowering their inhibitions to later sexual[ly] abuse that child." Madera explained that grooming could take any form if the intent were to "desensitize[] sexualization to a child." She cited sleeping in the same bed as an example of grooming. In addition, Madera testified that a perpetrator will often groom not only the child, but the family and the community, to not only gain access to the child, but so that nobody will believe the child if the child eventually discloses the abuse.

22

Although Madera conceded that children, like everyone, sometimes lie about things, she stated that it is uncommon for children to lie about sexual abuse. She discussed symptoms, diagnoses, and treatment, both generally and individually as they relate to Eva. More specifically, Madera testified that inpatient treatment is aimed at stabilizing the child. She explained that when a child outcries after a long period of silence, "their world, basically, blows up." As a result, the "child really can be unstable at that point."

Madera further explained that since abuse can cause the victim to be emotional, and since children have different personalities and therefore react differently to abuse and disclosure, their emotions may vary greatly. Children may appear angry, aggressive, distraught, or display no emotion. Moreover, an abused child's emotions may change over time, depending on how well the child processed the events. There are, however, fairly consistent signs of sexual abuse in the following general categories: anxiety, depression, interpersonal difficulties, and sexualized behaviors.

Madera defined anxiety as "hyperarousal to the events that have happened[,]" noting that children often are diagnosed with post-traumatic stress disorder ("PTSD"), and may suffer from nightmares, flashbacks, constant worry, and similar symptoms. According to Madera, Eva's medical records reflected that Eva "was

very consistent about nightmares and flashbacks . . . through every hospitalization[.]"

Madera testified that depression may look like "being down," or may manifest in self-harm or an eating disorder, such as anorexia or bulimia. She explained the correlation between sexual abuse and an eating disorder is the abused child's attempt to regain control over his or her own body. In Eva's case, Madera noted signs of depression, in that Eva lost interest in activities she once enjoyed, and she had "some eating issues[,]" and attempted suicide.

Eva's records also showed that she displayed anger or irritability, which Madera explained is a sign of sexual abuse in children who are not able to appropriately express their emotions. Lack of self-esteem can be a symptom, since sexual abuse lowers a child's self-esteem and because perpetrators often victimize children with low self-esteem.

Madera further noted that interpersonal difficulties may be a symptom of abuse, since abuse victims have trust issues that make it difficult to make friends. She noted that Eva apparently lacked social skills and interacted inappropriately with her peers. Although Madera acknowledged that Eva was diagnosed with autism at age eleven, later than it is usually diagnosed, and further acknowledged that autism is associated with interpersonal difficulties, she testified that it was difficult to determine whether Eva's interpersonal difficulties were due to autism or trauma.

As for sexualized behavior as a symptom of abuse, Madera testified that it is the symptom "most correlated with sexual abuse" because children, especially younger children, who were not sexually abused "wouldn't have that knowledge to be telling same-age peers about sex or having advanced conversations about it." Madera considered Eva's "excessive masturbation" at school to be "a sexualized behavior that's more indicative of abuse." While Madera testified that she would consider a child's access to pornography as it would affect sexual knowledge, she noted that Eva was eleven at the time of her outcry, and therefore would have had less exposure to pornography than an older child would have.

In addition to the above-referenced symptoms, Madera observed that Eva regressed, meaning that Eva's behavior went back to a previous developmental stage. Not only did Eva wet the bed and behave like a three-year-old child, she also had recurring hallucinations and delusions, both of which are symptoms of PTSD. Madera conceded that there could also be a genetic component to these symptoms. Eva also resisted bathing. Madera explained that this resistance may be from an abuse victim's reluctance to "deal with or face their bodies because it causes such shame and guilt."

While Madera recalled that Eva was taking multiple medications, she could not testify why those medications were prescribed, since she does not prescribe medications and is not a psychiatrist. She did acknowledge that according to Eva's

25

medical records, Mother sometimes discontinued Eva's prescribed medications. In addition, Madera acknowledged that Eva's records showed that she had panic attacks, abused animals, made and recanted an abuse allegation against Stepfather, stole things, and had another side of her named "Isabel."

Madera disagreed with Eva's diagnosis of bipolar I disorder with psychotic features and intermittent explosive disorder based on "the severe trauma [Eva] has endured." She did, however, agree that Eva had been diagnosed with attention deficit hyperactivity disorder, unspecified anxiety disorder, major depression with psychotic features, opposition defiance disorder, and an IQ of seventy-four. Madera believed Eva had PTSD, which could account for the psychotic features and many of Eva's other symptoms. Eva's trauma would account for her hallucinations, but not if she had hallucinations from the age of two.

Madera stated that the purpose of her testimony was to educate the jury about sexual abuse and not necessarily to state that Eva had or had not been sexually abused. She noted, however, that Eva's symptoms were consistent with sexual abuse.

"Roxanne's" Testimony

Roxanne testified that she was Cooley's former stepdaughter, and that she was in her thirties at the time of trial. She was about six years old when her mother married Cooley and was about eight or nine years old when they separated. While

Cooley and Roxanne's mother were married, Roxanne, her brother, her mother, Cooley, and Cooley's son all lived in the same house.

After Cooley and Roxanne's mother separated and Cooley moved out of the home they had shared, Roxanne and her brother visited Cooley and his son at their apartment. She estimated that she was about nine years old at the time of that visit. During that visit, while Roxanne's brother and Cooley's son were in a different room, Roxanne and Cooley were in his bed in their underwear. She recalled that Cooley was lying on his back and that he had her lie on top of him, facing him, and "move back and forth or up and down[.]" Roxanne continued, stating that she "wasn't really aware of what it was, but [she] could feel something hard somewhere like between my stomach and private area." She further remembered "feeling that it wasn't right, that it shouldn't be happening and just that something was wrong."

The next thing Roxanne remembered was being at home, being on the telephone with her father who was then living abroad, and telling him what had happened. She did not believe that this event was reported to CPS, but did remember that after she told her father what Cooley had done, Roxanne never saw Cooley again. When Roxanne was thirteen or fourteen years old, she told her mother what happened at Cooley's apartment. Roxanne also mentioned a time when she was eight or nine years old that Cooley kissed her with his mouth open, which she described as feeling "wet[,]" and "strange, not normal."

27

Although nobody reported Cooley at the time, Detective Lee first contacted her about Cooley in about January 2020, and they spoke again "on several occasions[.]" She thought she would never have to discuss the matter again, and said it made her "real sad to hear somebody else had been impacted."

"Deirdre's" Testimony

Deirdre testified that she was a retired social worker who had worked with individuals with mental health issues and intellectual disabilities. She identified Cooley as a member of her extended family. She testified that she was in her mid-fifties at the time of trial, and that Cooley was nine or ten years older than she was. When she was a child, she loved and looked up to Cooley; she recalled that she grew up spending time with him, that he played with the children, and that he was "fun[.]"

When Deirdre was about six years old, Cooley was babysitting her at "Gammy's" house. Cooley retrieved a knife from the kitchen and told Deirdre that he "was going to hurt himself if [she] didn't do what he said[.]" Cooley then "took [her] to his bedroom[.]" Cooley had Deirdre remove her clothes, and then "he had [her] – he had [her] do stuff that [she] did not want to do. He told me that – he had [her] suck . . . his penis[.]" She recalled that she was crying and "telling him, No, [she] didn't want to do this and he told me that he needed me to do this and that I couldn't tell anybody[.]" She also remembered that Cooley was "pushing [her] head and [she] told him no and [she] remember[ed] choking[.]" According to Deirdre,

28

Cooley also told her "he would have to hurt himself or [her] mom and dad" if she told anyone. Deirdre recalled being "scared[,]" and wanting her parents and grandmother to come back.

Deirdre explained that when she was "a little older," she felt Cooley's penis on her bottom when he held her on his lap and moved her body. Deirdre testified that this "happened a few times[,]" and that Cooley's friend "Levone" did the same thing with another girl at the babysitter's house. Dierde explained that when she was about thirteen years old, Cooley took her out on the lake in a sailboat and told her "he wanted to show [her] something really cool, and he tipped the boat over." Deirdre testified that while under the boat, Cooley "proceeded to wrap his arms and legs around [her] and rub against [her] and [she] started screaming and telling him, No." Deirdre remembered that Cooley's penis was pressing against her "back and rear area[,]" and that she was "squirming trying to swim away and telling him, No." At that time, Deirdre also told Cooley that if he "didn't turn the boat back up and get out, and we get out of there, that [she] was going to tell everybody." Cooley then turned the boat back up and they returned to shore, but Deirdre did not tell any adults about the incident and confided only in a friend.

Deirdre testified that she saw a counselor because she had a difficult time adjusting to college, but she did not disclose Cooley's abuse. Deirdre moved in with her grandmother for a while and when she was about nineteen, her parents arranged

29

for her to live with Cooley while she attended school. When Deirdre visited Cooley's house, she saw that there was a lock on her bedroom door, which made her feel "a little better," although it "was awkward[,]" and Deirdre did not want to be there. Deirdre testified that she and Cooley had "kind of a weird relationship[]" while she lived at his house, and she recalled that Cooley sometimes treated her as his significant other and sometimes acted "like [her] big brother or uncle[,]" depending on the situation. In particular, when Cooley had a girlfriend, he treated Deirdre normally, but when "he didn't have a girlfriend, he treated [her] kind of awkward. It was like [she] was his partner in his home." Deirdre did not recall how long she lived in Cooley's house, stating that she had "tried not to remember[]" that time in her life.

Deirdre testified that she worked for CPS for ten years, but after personal and work-related issues caused Deirdre to have "kind of a breakdown[,]" resulting in a suicide attempt, she left CPS. After seeking treatment, Deirdre told a therapist and her parents about Cooley's abuse but did not report it despite a therapist telling her to do so before he hurt someone else. Deirdre explained she did not report Cooley because she "was still battling within [her]self." After word spread of Deirdre's accusations against Cooley, the family split. People took sides and asked Deirdre questions, and she "[did]n't know who to trust[.]" She described Cooley's abuse as "not something I want everybody to broadcast about me."

30

She described testifying as "a bag of mixed emotions. It's scary, and it's hard, but at the same time, it's kind of a relief."

<u>Mother's Testimony</u>

Mother testified that she has worked as a labor and delivery nurse for more than twenty-seven years. She has two children: Eva and Eva's half-sister, Erika. At the time of trial, Eva was fifteen years old, and Erika was twenty-five years old. Mother outlined the times that Eva visited Cooley, recalling that, in addition to many other times, Eva spent the month of July with Cooley in 2017.

Based on Mother's observations, she believed that Eva and Cooley had a good relationship before 2017. In June 2017, however, after spending a weekend with Cooley, Eva began to be irritable and angry, and these emotions worsened over time. Eva's anxiety and depression increased, and she would scream "[h]e's going to kill me." She also had hallucinations. Mother understood they were caused by medication and she disagreed that Eva had hallucinated since she was two or three years old. In addition, Eva sought and watched pornography, experienced regression, bedwetting, nightmares, and had an alter ego named Isabel or Isabella. Mother explained Eva attempted suicide with a drug overdose, after which Eva spent ten days in an acute-care psychiatric facility followed by six to eight weeks in a long-term care facility.

Eva also showed signs of ADHD, revolving around school, focus, and concentration. Mother sought professional help to address Eva's mental health, and Eva saw a therapist and was prescribed medication. At the time of trial, Eva was taking Risperidone/Risperdal; Prozac, an antidepressant; Mirtazapine, to help her sleep; and Prazosin, to prevent nightmares. Mother listed Eva's prior medications, which included Abilify, an antipsychotic and mood stabilizer; Risperdal, an antipsychotic; Topamax and Trileptal, mood stabilizers; Clonidine and Trazodone, for sleep; Concerta, Focalin, Methylphenidate, and Vyvanse, for ADHD; Depakote, a mood stabilizer and antiseizure medication; Lexapro, an antidepressant; and Prazosin, a blood pressure medication for trauma.

In mid-December 2018, after returning from visiting Cooley, Eva was "very angry[]" and Mother refused to leave Eva until she explained why she was so angry. Eva then asked Mother, "[i]f I tell you something, do you promise not to tell [Cooley]?" Eva proceeded to disclose that Cooley wanted Eva to cuddle with him, and that he "spanked her bottom, . . . and that he was rubbing her butt, and then, she could feel his private parts against her private parts." Mother did not know what to do about Eva's disclosure, so she decided to take Eva to counseling. The psychiatrist Mother consulted told her that the abuse she described could be the cause of Eva's behavior. Mother later took Eva to Children's Safe Harbor after CPS contacted her and arranged Eva's forensic interview.

32

Cooley's attorney recalled Mother to testify after Terri testified, to ask Mother about her relationships with Cooley and with her late former husband and his family. Mother denied that she attempted to obstruct her late former husband or his family from seeing her older daughter, that she threatened to call CPS about her older daughter's custody, or that she accused her former mother-in-law of assaulting her. Mother also denied that she prevented Eva from visiting Cooley or that she alleged that Cooley kidnapped Eva.

Kathy's Testimony

Kathy testified that she was formerly married to Cooley and has an adult son fathered by Cooley. Although she and Cooley were divorced by the time of trial, Kathy testified that she considered Cooley a good father. Kathy testified about the time that Deirdre lived with Cooley, recalling that Deirdre's time living with her grandmother did not work out because Deirdre "didn't like rules." Kathy also called Deirdre "emotionally immature[,]" and stated that Deirdre was "a party animal[]" during the time she lived at Cooley's house.

When asked about portions of Deirdre's testimony, Kathy testified that there was no deadbolt lock on Deirdre's bedroom door, and that she never saw Deirdre acting uncomfortable around Cooley. She further testified that Eva came to her daycare facility, but she never saw Eva acting strange around Cooley. Instead, Eva "would get excited when [Cooley] came to pick her up." Kathy stated that she was

"kind of just blown away[]" by the charge against Cooley. She did not believe Deirdre's allegations of Cooley's abuse, and did not think that Cooley's family believed the allegations, either.

Kathy also testified that her daughter-in-law worked at her daycare facility and had never reported any signs that Eva was abused, despite having been trained to recognize such signs. While Eva attended Kathy's daycare facility, Eva did not talk to people who were not there and was not a zombie, but seemed like an active, normal child.

In Kathy's opinion, anyone alleging physical abuse in Cooley's home "would be wrong[.]" She denied having told Detective Lee that Cooley bullied her to get custody of their son, although she conceded that Cooley could be a bully. She agreed that Cooley could be stubborn, and that she had learned over the years that it is sometimes not worth it to fight with him. She would not say that Cooley threatened people, but did acknowledge that he once threatened to kill her and her current husband and that she reported the threats to the police. She later testified, however, that she did not really believe Cooley would kill her.

Ronald Munday's Testimony

Ronald Munday ("Munday"), Cooley's friend, testified that Cooley's mother was his neighbor before she died. After Cooley's mother died, Cooley moved into her house. When Eva visited Cooley, she visited Munday and his wife, also, calling

34

them Nana and Pawpaw. The Mundays also babysat Eva when Cooley was out, and saw no signs that Eva was abused or that she had serious mental health issues. To the best of Munday's recollection, Cooley moved away when Eva was about eight or nine years old. Although Munday and Cooley remained in contact after Cooley moved away, Munday did not continue to see Eva.

Linda's Testimony

Linda testified that she was Cooley's fourth wife and that she and Cooley were married from about 2016 to 2017. She met Eva when Eva was about four years old. She characterized Eva's personality as sensitive, emotional, and sometimes very sassy, but remembered that Eva was not comfortable undressing in front of others and that she had a lot of urinary tract infections, even though they taught her about hygiene and bought her cotton underwear. In addition, she testified that during the time she and Cooley were together, Eva was never alone with Cooley. Linda also denied that Eva ever was locked in her room.

When asked what Cooley told her about the trial, Linda stated that Cooley denied Eva's accusations and denied Deirdre's allegations. She further stated that Mother "put [Eva] up to a lot[]" and agreed that she would believe that Mother put Eva up to making the allegations against Cooley if someone told her so.

Gail's Testimony

Gail testified that although she and Cooley were never in a dating relationship, Cooley was "a longtime, family friend[]" she had known for eighteen years or more. She recalled knowing Eva since she was a baby and she had seen Eva from time to time at cookouts, birthdays, and when Eva visited Cooley. According to Gail, Cooley "spent good, quality time" with Eva, and she thought Eva "liked being around" Cooley. Gail never detected any indication that Eva was afraid of Cooley or intimidated by him. According to Gail, Cooley told her that Mother "may have had something to do with [Eva's accusation.]"

Nadia O'Bryant's Testimony

Nadia O'Bryant ("O'Bryant"), a counselor at Eva's school, testified about her dealings with Eva. She recalled that when Eva was starting sixth grade, she visited O'Bryant "almost daily, sometimes more than once a day[.]" During those visits, Eva exhibited both physical and behavioral health issues, including frequent urinary tract infections. Eva also reported flashbacks, and twice went into "a trance-like behavior."

After Eva was transferred into special education classes, she visited O'Bryant less frequently. By the time Eva was in eighth grade, O'Bryant "hardly saw [Eva] at all." Eva made, in O'Bryant's words, "a drastic improvement."

Dudley Hawkes's Testimony

Dudley Hawkes ("Hawkes") testified that he was Eva's school principal during her sixth and seventh grade years; he was retired at the time of trial. He testified that Mother documented Eva's "autism, which is a condition that would qualify [Eva] for special education." Accordingly, the school transferred Eva to special education classes, where both the quantity and content of the classwork was modified to fit Eva's abilities. Hawkes, however, questioned the validity of this diagnosis, as it came from a provider he did not recognize.

After Eva transferred to special education classes, the number of times she left class, visited the nurse, or visited her counselor "dropped in frequency tremendously." Hawkes recalled two incidents that involved Eva. In one incident, Eva was on the school bus and was showing pictures on her phone to other students; although Hawkes did not see the pictures, they reportedly were pornographic. The other time, Eva was in her classroom and was "frozen."

Cameron's Testimony

Cameron, Cooley's son, called Cooley "[a]n amazing father," and recalled that while he was growing up, Cooley had him involved in sports and scouting, and that Cooley accompanied him on "[e]very campout[.]"

Counsel asked Cameron about allegations made by Roxanne and Deirdre. Cameron stated that he did not get along with Roxanne or her brother and that

Deirdre's allegation was "kind of a rumor that ran in the family[.]" When asked on cross-examination whether he would allow Cooley to care for his baby despite the sexual abuse allegations, he replied that "without a doubt[]" he would permit Cooley to do so.

Levone's Testimony

Levone testified that he had known Cooley for about fifty years, and that he and Cooley spent time together either at Levone's house or playing outside during the summer. Although Levone acknowledged that his mother babysat children in their house, he testified that he and Cooley did not spend a lot of time in the house with his mother and the children, but were instead outside, riding their "bi[]cycles or skateboards and sometimes playing kickball or a basketball out in the street." Levone testified that he knew Deirdre, since she lived down the street, and he called her allegations of sexually inappropriate conduct "an absolute[] lie." Although he acknowledged that if his grandchildren wanted to go somewhere with someone accused of sexual abuse, he would not permit it, he stated he had no problem allowing Cooley to be around his family, including his grandchildren.

Bianca Davis's Testimony

Bianca Davis ("Davis") testified that she was a CPS investigator. Davis interviewed Eva in conjunction with concerns over emotional abuse and neglectful supervision after there was an allegation that a piece of plywood fell on Eva's leg.

38

Pursuant to CPS procedure, Davis asked Eva whether she had food and whether anyone had touched her private parts, and Eva responded that only her mother had done so. Eva did tell Davis that she wished she were dead or were never born.

José Alaniz's Testimony

José Alaniz ("Alaniz") testified that he was the CPS investigator handling Eva's case alleging Cooley's improper touching. During that investigation, he spoke with people at Eva's school, with Eva, Mother, and Stepfather. Although Alaniz contacted Cooley by telephone, Cooley declined to speak with Alaniz before consulting his attorney. At the time of his investigation, Alaniz was unaware of Eva's allegations that Cooley was sexually assaulting her.

Terri's and Javier's Testimony

Terri and Javier are Mother's former in-laws and the aunt and uncle of Eva's older half-sister, Erika. Javier is the brother of Mother's late former husband, and Terri is Javier's wife. Terri testified that she met Cooley only once, "[a]t least, like, ten[]" years before trial, during an exchange of possession of Erika. When asked for her opinion of Mother's character for truthfulness, Terri stated that she had a "bad[]" opinion of Mother's truthfulness, and that she had a sound basis for her opinion that Mother was "not truthful."

When the State objected to the relevance of Terri's testimony, the following exchange occurred during a bench conference:

39

[THE STATE]: I know that Defense counsel was attempting to ask [Mother] about issues between [Mother] and [late former husband] and custody disputes or child issues with [Erika]. I don't think that -- at that point, you said that was not relevant, and I feel like anything she would have to add would not be relevant to anything in regards to motive or bias in this particular matter.

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL]: This goes towards 613 (b)[], specific instances of conduct. It's very relevant, and she is, like I said, the sister-in-law to [Mother's late former husband]. [Mother's late former husband] is [Erika]'s father. He passed away when [Erika] was 12. In dealing with Mother, regarding the family and family dynamics, she was very involved in that and still involved with [Erika] to this day. I think she met my client one time, and so, she's a witness to that with the dynamics of the custody. She's also a character witness as to [Mother's] truth and veracity. That's a separate issue, general, not specific. This is a five- or ten-minute witness.

THE COURT: You said 613 (b)[]?

[DEFENSE COUNSEL]: Yes, Your Honor. It's not with the aspect of the statements. It's the aspect of action and circumstances.

THE COURT: Can you point to me where that is?

[DEFENSE COUNSEL]: Still covered by 613 (b)[]. There's one section that talked about impeaching statements. That's not what I'm dealing with.

THE COURT: I'm under 613 –

[THE STATE]: 613 (b)[].

THE COURT: Witness' bias or interest?

[THE STATE]: Yes. It still has the foundational requirements. The foundational requirement is that they have to use extrinsic evidence through this witness which – separate from questioning [Mother]

40

directly about it. So, this triggers No. 4 which says that extrinsic evidence of a witness' bias or interest is not admissible unless the witness is, first, examined about the bias and interest and fails to unequivocally admit it.

I think that threshold hasn't been met because [Mother] admitted the custody and all that –

[DEFENSE COUNSEL]: She did in certain parts, but in parts of obstruction of custody, she denied.

[THE STATE]: I would say this witness, everything she knows would be based on hearsay from [Mother's late former husband]. She was the sister-in-law. So, their custody issues –

[DEFENSE COUNSEL]: She was part of it.

[THE STATE]: I think there's a couple of things. We didn't ask a question about what members of the community she's familiar with and, also, [Mother] to make sure she has the foundation –

[DEFENSE COUNSEL]: It's her personal opinion, not reputation of the community.

[THE STATE]: Got it. I think it's just her personal – okay. Her personal opinion, then, is kind of on the collateral issue here. It would be based on hearsay. We have established that she hasn't known her for a while, and it would be – this is –

THE COURT: I will interrupt you and back you up for a minute as to her – as to reputation for truthfulness.

[DEFENSE COUNSEL]: Two aspects. I could ask what is [Mother's] reputation in the community.

THE COURT: First, you have to ask if she knew it.

[DEFENSE COUNSEL]: The other aspect is: Does she have a personal opinion?

THE COURT: Where are you coming under that?

41

[DEFENSE COUNSEL]: 608 and 404 (a)[]. I think in the Dixon case the State produced, it talks about 608 versus –

THE COURT: 608 is a witness' character – witness' character for truthfulness or untruthfulness, (a)[], is reputation or opinion evidence.

[DEFENSE COUNSEL]: This is just the opinion –

THE COURT: Witness' credibility may be attacked or supported by testimony about the witness' reputation – which you are not doing – or by testimony in the form of an opinion about the character, that character being truthfulness or untruthfulness.

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: But evidence of truthful character is admissible only after the witness' character for truthfulness has been attacked.

[THE STATE]: That would be for us. So, I think they are able to ask her, her opinion for truthfulness as it relates to [Mother] without the foundation – as to [Mother] because that's the person she knows. She cannot go into specific acts of conduct if it's under 608 (b)[], specific acts of conduct.

[DEFENSE COUNSEL]: I agree.

[THE STATE]: And then, as it relates to – because of extrinsic evidence, four does not allow –

THE COURT: Tell me if I'm wrong, but 613 (b) dealing with witness' bias or interest still has the contents of the statement, time and place that the statement –

[DEFENSE COUNSEL]: I'm not talking about the statement. I'm talking about circumstances and observations, not statements.

[THE STATE]: That's – Dixon v. State does say –

THE COURT: But the Rule itself does not say that?

42

[THE STATE]: It does not say "circumstances" until we get to opportunity to explain. All of a sudden, it's included there.

THE COURT: But based on the opportunity – witness must be given the opportunity to explain or deny the circumstances or statements that tend to show the witness' bias or interest.

[THE STATE]: Yes.

THE COURT: What areas did you think you covered that with, with [Mother], and did you ask the court reporter to pull that?

[DEFENSE COUNSEL]: I cannot remember.

[THE STATE]: I object under 403. The probative value of this person's opinion of [Mother] married to this –

[DEFENSE COUNSEL]: Her brother – she's married to [Mother's late former husband's] brother.

[THE STATE]: -- married to his brother –

THE COURT: [Mother's late former husband]'s brother?

[DEFENSE COUNSEL]: Yes.

[THE STATE]: -- regarding custody of somebody – it has nothing to do with what's happening in this trial. The probative value is extremely low.

[THE STATE]: Aside from that, this is that witness' bias. That's when the witness is on the stand. This is extrinsic. So, here, we are trying to use the witness' bias section to offer character and conformity which is not allowed under character evidence.

THE COURT: I'm going to sustain under 613 (b)[]. However, I'm admitting under 608 (a) dealing with character for truthfulness as to her opinion if the proper predicate is laid for said opinion.

43

After the defense recalled Mother as a witness and Mother denied having tried to obstruct visitation rights regarding Erika, Eva's half-sister, or to have Cooley charged with kidnapping Eva, another bench conference ensued:

[DEFENSE COUNSEL]: I think I have met the foundation for 613 (b) as to interest, motive and bias of [Mother] and going into specifics, not statements, but specific circumstances through Terri in response to her denials.

[THE STATE]: I think this is a collateral issue. We have motive and bias with [Mother's late former husband], but not connected to Timothy Cooley except for putting it for character and conformity which isn't permit[ted].

THE COURT: It does appear to be going towards [Erika] and not the facts at issue dealing with your client, [Eva] and [Mother] is what I was understanding.

[DEFENSE COUNSEL]: Our position is this – the allegation against Mr. Cooley started with CPS – multiple CPS allegations and, ultimately, getting to a sexual allegation. It started with allegations of physical abuse and allegations from our side that [Mother] obstructed Mr. Cooley from having lawful possession of [Eva]. I think [Mother] touched upon that. The State touched upon it in opening and in direct.

THE COURT: You have this witness. If you had [Mother] unequivocally denying it, then you could, through extrinsic evidence, if I'm understanding arguments, bring it in. I'm not hearing the tie-in with Terri [surname redacted] as to that – those specific instances.

[DEFENSE COUNSEL]: And now, that's what I intend to do with Terri.

[THE STATE]: She hasn't seen her in over ten years.

[DEFENSE COUNSEL]: I asked about CPS allegation and threat on –

[THE STATE]: That's as to that family.

44

THE COURT: We are talking about as to the threat with [Mother], I guess, to the allegations of kidnapping, the threat there.

[DEFENSE COUNSEL]: She did the similar thing to the [surname redacted] family.

THE COURT: That's not a fact in dispute as to the fact issue for this trial.

[DEFENSE COUNSEL]: It goes towards motive and bias and –

THE COURT: Are you objecting?

[THE STATE]: Yes.

THE COURT: What are your objections?

[THE STATE]: Objections are under improper character evidence, improper opinion, improper extrinsic evidence and under 608, 613, 403, 608.

[DEFENSE COUNSEL]: My relevance is Detective Lee thought it was important to ask her directly about if she had done those things with the [surname redacted] family, and that's their expert who delved into it. She denied it to him, too. So, it was irrelevant. I don't think he would have investigated it, and that's how we stumbled on the name of the witnesses.

[THE STATE]: He didn't testify that and he followed that trial once someone he talked to on what Cooley said and he followed up on it.

THE COURT: I'm –

[DEFENSE COUNSEL]: To tie it with other witnesses –

THE COURT: I think if Ms. [surname redacted] could testify as to any extrinsic evidence in relation to that unequivocal denial from [Mother], I think that would be a viable option, but based on what you have proffered and as to the fact that this goes to [Erika] and a different husband involving a different – mother of a different child, then I'm

45

going to sustain under improper character evidence, improper opinion under 608, 613 and 403 –

[DEFENSE COUNSEL]: Under 613 –

THE COURT: -- in and of itself as to the extrinsic evidence as it has to be the witness' statement and/or the wording used in 613 (b) numerical situation below that, circumstances or statement. So, I'm finding that, as well, that it does not meet that threshold.

Javier testified that although he had a relationship with his niece at the time of trial, there were times that he did not "because we couldn't see her." Javier shared Terri's opinion of Mother's honesty, stating, "[s]he's not an honest person."

Debra's Testimony

Debra testified that she married Cooley in August 2020, about a month after Cooley's arrest, and they remained married as of the time of trial. She met Eva when Eva was nine or ten years old and considered Eva to be "the most precious daughter that I never had," and stated that the way Cooley acted toward Eva he thought Eva was "beautiful." Debra called the allegations against Cooley "crap."

Cooley had Eva do chores when she visited, and planned activities, such as the zoo or the rodeo, rather than giving her expensive gifts. As for Eva's medication, Debra testified that Mother initially sent Eva's medications in a pill organizer, and they did not know why the medications were prescribed. Cooley therefore was reluctant to give Eva medication without knowing its purpose.

Debra recalled that her opinion of Eva's honesty was "not very good[]" because Eva lied and stole things. As an example, Debra recalled that when Eva was nine or ten years old, the two of them were working in the garden when Eva began talking to fairies and stated that she believed in them as did Mother and Eva's half-sister, Erika. She testified that when Mother did not want to drive to Cooley's home to retrieve Eva after a visit, Mother threatened to have Cooley arrested for kidnapping Eva.

Juror 63[4]

On the third day of trial, Juror 63 received a call that her ten-year-old son was ill, and she therefore needed to pick him up from school. The juror advised the trial court that she was a single parent and had no family members or others in the area who could pick up her child, since her extended family lived in East Texas and "[e]verybody works." Juror 63 stated that she had not claimed her exemption for caring for a child under twelve because her son attended school and day care during business hours, so she thought she would be able to serve on the jury during those times.

The trial court and Juror 63 then discussed the possibility that the child might not recover by the following Monday:

---

[4] These discussions took place outside the presence of the other jurors.

THE COURT: Is it fair to say that if your child is ill today and remains ill – remains ill Saturday, potentially, Sunday and, possibly, even Monday, that you don't have supervision or care for him?

THE JUROR: Correct, yes.

THE COURT: That you are the only one?

THE JUROR: Yes.

. . . .

THE COURT: Okay. If you were able to leave today and pick your child up, would it be your intention, since he is ill, that you wouldn't foresee bringing the child back to the courthouse because he is ill?

THE JUROR: Correct.

THE COURT: Will you be taking the child to a clinic or doctor – possibly, today and/or, if not well in the next 24 to 48 hours, do you intend on, possibly, taking the child to a doctor?

THE JUROR: It depends on his condition and how he is after just, you know, maybe some over-the-counter meds, if he's better with that, but if it – if it did not get better, I would have to take him to the doctor.

. . . .

After the trial court consulted with counsel for Cooley and the State, the attorneys and the court had the following exchange:

[THE STATE]: Article 33.011 of the Code of Criminal Procedure addresses alternate jurors, generally, but specifically, in Section B while – after it says, "alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury renders a verdict in guilt or innocence of the defendant and, if applicable, the amount of punishment, become or are found to be unable or disqualified to perform their duties or are found by the Court, on agreement of the parties, to have good cause for not performing their duties, then the next

48

alternate in line" -- I think you said that was 70 – would be – "shall be drawn and selected in the same manner, shall have the same qualifications, shall be subject to all of the same examinations and challenges," but we already did that in the process of jury selection since we already have them.

I think the law allows for a couple of things: A finding that they are unable or disqualified to perform duties or found, after agreement by the parties, by the Court, there is good cause for not performing duties. That's what we found.

. . . .

THE COURT: [Defense counsel], where are y'all on this?

[DEFENSE COUNSEL]: As a parent, I think we all feel what she's going through. I guess our proposal is because of what she's going through with her kid, excuse them and –

THE COURT: I, certainly, think if the parties, without fail, having – having had this happen twice before, if the parties are in agreement to excuse Juror 63 because she has become disabled, that if y'all are in agreement, I think the Court has to place the first alternate in the position. The request was for two alternates and that was granted and that was given and they have been seated the entire time and I show from the paperwork from voir dire that, that would be Juror No. 70 as the first alternate.

So, are you in agreement?

[THE STATE]: Judge, I will say, yes. I think we run into an issue, if we don't release her, of other jurors having issues after Monday.

THE COURT: She did say on the record on the brief inquiry that was made that if the child remains ill, that she will be seeking out either a clinic or a doctor. So, I don't – dealing with a 10-year-old that's ill, there's no way to tell what's going to happen over the weekend. I think the fact that there are two alternates is the whole reason you have alternates.

49

So, [Defense Counsel] are you in agreement or not in agreement?

[DEFENSE COUNSEL]: Judge, just looking at our chart and some of the questions through jury selection, my notes, I don't feel we can agree, Your Honor.

THE COURT: You cannot agree?

[DEFENSE COUNSEL]: Correct.

THE COURT: So, what are you proposing?

[DEFENSE COUNSEL]: I mean, I know there's not a lot of alternatives. I propose [we] finish for the day. We still have our witnesses here, just get them sworn – our case is streamlined. So, I think the target is still to try to finish Monday. . . .

THE COURT: In the event that Juror No. 63 still has no supervisor, which she won't, for her child, and if that child is still sick, whether that be the school during the day or aftercare. So, I don't know that's an option at this point.

[THE STATE]: Judge, I think the other provision related to –

THE COURT: What's the other provision?

[THE STATE]: 36.29. It talks about death or disability.

THE COURT: That's what I was looking – as to the disabled – 36.29?

[THE STATE]: Yes, Judge.

THE COURT: I believe this is the provision that I was in-contact with in the past.

Okay. So, "after the trial of any felony case begins and a juror dies or, as determined by the Judge, becomes disabled from sitting at any time before the charge of the Court is read to the jury, the remainder of the jury shall have the power to render the verdict, but when the verdict shall be rendered by less than the whole number, shall be signed by

50

every member of the jury concurring in it. If alternate jurors have been selected" – and that's dealing with a capital case.

[THE STATE]: I'm accompanied here by Mr. Harris who is not speaking to you because it's Friday and dress Code rules apply, but he has informed me and let me know that courts construed these two sections together, the alternate juror section, as well as this. So, if there's nothing on point, specifically, to this that, they are construed together, and disability is construed broadly under that. I think, specifically, it looks like –

THE COURT: I'm going to turn everybody's attention right now to – I think everybody is in agreement that for it to be less than 12 jurors, that, certainly, a defendant may waive the requirement not less than 12 can return a verdict in a noncapital felony case which is not what we are dealing with, but we can all agree that has to be agreed to for less than 12.

So, I want to – then, I want to turn you to [*Scales v. State*], 380 S.W.3d 780. The trial court has discretion to determine whether a juror has become disabled and to seat an alternate juror. That goes on to say that the appellate court interpreted Article 36.29 to require that a disabled juror suffer from a physical illness, mental condition or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror –

Based on the inquiry I made with Juror 63, she certainly was distraught. She was emotionally concerned about her child. She was emotionally concerned that – I believe each day in court we have seen that she has been concerned at the 5:00 hour because she's fearful she's not going to get to pick her child up. Today she's very fearful her child is ill and she has not been allowed to be released to pick her child up while he's ill upon receiving the phone call from the school. She's, also, very concerned about his illness and taking care of him this afternoon, this evening and whether or not he will still be ill Saturday, Sunday and Monday. She also, as was stated earlier on the record to both the parties, she already was having great concern over the fact that she would not be allowed to part from the jury during deliberations and had much hesitation and fear – much hesitation and fear that she wouldn't be able to pick her child up and she had no one to peck [sic] her child up and

51

she was not aware that she could not separate from the jury during deliberations, which I think has played – I came out and told the parties that earlier, that she did seem to be a little bit in distress over that thought.

So, unless either side can direct me where they don't believe the Court can determine whether or not the juror has become disabled –

[THE STATE]: The State's position is that you absolutely can.

[DEFENSE COUNSEL]: Our position is I think it's premature. I understand the sick child and feel for her as a parent. My children have been sick, and especially, my son, and I have been able to deal with it. I think it's premature. For instance, if the young man is not well by Monday, sure. That's a game changer, but a sick child that's going to happen to anyone. I think the jurors are from our community. They are family members, fathers, mothers, single parents, may have other issues, health issues. We have to deal with it in this industry, and I just say it's premature to deem her disabled for a sick child at this point. So, our proposal is to cut them loose and let her go take care of her kid and hopefully, he will be better and if he's still sick, Monday –

THE COURT: Keeping in mind when I was going over the factors of determining whether one was disabled, that I am and have been telling the parties throughout today's court session that the Court was very concerned about the Juror No. 63 and her emotional condition or mental state as it applied to deliberations, not having that knowledge that they cannot separate on the front-end and her concern over maybe not being able to get to her child by the 6:00 o'clock hour, just today realizing that she couldn't separate once they were deliberating.

If you will recall from the conversation that you, [names of counsel], I believe [other attorney for the State] was there and that the Court's concern, at that time, was I didn't want deliberations rushed on either side in order to provide a fair, full consideration of all the evidence, that I was concerned about Juror No. 63 and the fact that her mental state might be one of which she was placing more emphasis on being able to get to her child than she was to consider the evidence. So, that would be part of my determination as her being disabled.

52

Did you want to respond with anything?

[THE STATE]: Yes, Judge. In [*Foyt v. State*], which is 602 S.W.3d 23, it says that – in this case, a juror was incarcerated, and the appellant complained of the duration of that incarceration requesting a delay or inquiry to how long. In [*Foyt v. State*], it says that the trial court did not abuse its discretion by discharging the juror without doing so. It also goes on to [cite] [*Romero*], which 396 S.W.3d at 144 to 45 saying the trial court did not abuse discretion in removing a juror for [a] stomach ailment, headache and lack of sleep and relating to postponing and consideration, there is [*Lopez v. State*] and [*Moore v. State*] which says that 36.29 does not require the trial court to consider postponing the trial in the event of a juror's disability and – in [*Moore*], concluding that the trial court did not abuse its discretion in overruling a request to postpone the trial and removing a juror with a stomach ailment under 36.29.

THE COURT: Anything else need to be placed on the record?

[DEFENSE COUNSEL]: We had Mr. Loring looking at the data he gave us, and my data tells us there's at least two other jurors with, what we deem, young children. They are going to have the same issues, and so, for due process concerns of our client having a fair and impartial jury of Juror No. 63 for reasons for the Defense, we think if that juror is deemed to be disabled – we don't feel she's gotten to that point yet. We think it's premature to deem her disabled because of her sick child. We think that's going to prejudice the Constitutional right to our client to a fair and impartial jury and the investment the Defense team has put into the jury selection and the information from Juror No. 63 throughout the course of our venire selection, we think releasing her is going to prejudice the defendant.

THE COURT: Okay. I'm making the determination that Juror 63 is disabled on a – on a two-part consideration, one from the inquiry that was made as to the phone call she has received here today concerning a child that is ill; second part being – which is that she is unable to concentrate at the 5:00 o'clock hour or after because she's more concerned about picking up her child, rightfully so, with no other supervision. She – emotional state and her mental state, I think that, that concern and worry is hindering her ability, and she is very concerned

53

about going into deliberations at any point in the case because she, now, is under the understanding that she cannot separate from the jury and – when that time comes, and she has great concern over how her child will be picked up at that time, which the Court did go over with the parties earlier and explained the Court's apprehension of that issue.

I have – the Court has discretion in making the determination of a juror being disabled. The Court, also, is under the understanding that there were two alternates chosen by the parties in jury selection, and they have been identified. To [Defense Counsel's] point, he did have assistance by Mr. Loring and juror evaluation during that selection period, which I would concede that was an investment in that selection process. I, also, would add that Mr. Loring was involved in the selection of the alternates, as well.

As to the argument of jurors with small children, I'm guessing, [Defense counsel] is saying they are currently seated on the jury, we have had ne [sic] struggles, at this point, with any other jurors concerning their children, concerning pick up times or concerning childcare issues. Juror No. 63, from day one, has expressed concern over this, and the Court has done everything they can to stop the trial at 5:00, but as everyone here knows, when this jury deliberates, they are on their own time. She, now, understands that, and that is giving her great concern that she will not be able to pick her child up. So, I'm determining her disabled on those two factors and moving to alternate juror – the first one on the list, which is Juror No. 70.

[DEFENSE COUNSEL]: Can I add one more thing for the record?
THE COURT: Yes, sir.

[DEFENSE COUNSEL]: I know you just talked about part of your analysis was Juror 63's concern once we got to 5:00 o'clock, but if I remember correctly, it was conveyed by the Court to Juror No. 63 that, that, although was a concern, but it was a ligament [sic] concern, and the Court would take that into account on her behalf. So, I don't think that's an appropriate factor to consider because she was told that – no problem. You have –

THE COURT: As to the days of court, you are correct, [Defense Counsel]. As to deliberations, I have no control over that, nor the hour,

54

nor the time and nor the law tells me and tells you . . . that they are not to separate during that time. We have no control over when that time will occur. So, I have ruled. Are you read [sic] to go?

[DEFENSE COUNSEL]: Yes.

The trial court then dismissed Juror No. 63.

Defendant's Offer of Proof

Cooley's counsel argued at trial that pursuant to Cooley's "Constitutional right to present a defense, Sixth Amendment right to confront, cross-examine and under 613 (b)," he should have been permitted to elicit testimony from Terri and Javier about Mother's conduct regarding a previous child-custody matter involving Eva's half-sister, Erika. Counsel explained his theory of admissibility as

> based on [Mother's] motive, bias and interest and testifying the way she did, and also correcting a false impression and then, Texas Rule of Evidence 107, the Defense proffers that I would ask Javier and Terri . . . about their experience with [Mother] preventing [Javier and Terri] from seeing [Erika], including during the legal times of access of Javier . . . and his daughter. [Mother] is [Erika] mother. . . . I was not allowed to do so.

> I anticipate their answers would have been, based on their direct knowledge on circumstances, that [Mother] did not allow them and blocked and prohibited the . . . family from seeing [Erika] during their lawful period of possession[.] . . . I believe that I'm allowed to do so because I was able to ask [Mother], and she denied it. So, under 613 (b), the forementioned rules, I was not allowed to question Terri and Javier . . . about whether or not [Mother] blocked it or if they contested her denial of that.

> Also, I wanted to ask Javier and [Terri] . . . if [Mother] made allegations – that she brought in CPS regarding allegations of abuse and negligent on [Mother's late former husband] and [Javier and Terri], as it related

55

to [Erika]. I asked [Mother] that, and she denied it. So, I wanted to get into that with Terri and Javier . . . . I was not allowed to do so. Their answers would have been that, Yes, they did have direct nonhearsay knowledge of and interpersonal knowledge . . . that [Mother] did involve CPS in their lives regarding allegations of negligent and abuse by [Mother's late former husband] and [Javier and Terri] of [Erika][.]

I would, also, have asked Terri and Javier . . . if [Mother] made allegations that . . . [Mother's former mother-in-law], . . . when she was 74 years old, . . . assaulted [Mother], and there was an investigation. I was not allowed to do so, and I asked [Mother] a direct question. She said that did not happen. Therefore, I want to ask those questions of Javier and Terri . . . , and their answers would have been, yes, based on direct knowledge that, that did happen. There was an allegation that was investigated, and they had direct, personal knowledge of those circumstances that [Mother] alleged that [Mother's former mother-in-law] . . . assaulted her when [Erika] was, approximately, 2 years old.

## Texas Code of Criminal Procedure art. 38.37

The trial court held hearings regarding the admissibility of Roxanne's and Deirdre's testimony to determine whether this evidence of Cooley's extraneous offenses would "be adequate to support a finding by the jury that [Cooley] committed the separate offense[s] beyond a reasonable doubt[.]" Tex. Code Crim. Proc. Ann. art. 38.37 § 2-a. The court conducted these hearings outside the jury's presence.

During these hearings, Roxanne described the time she and Cooley were alone in his bedroom, and he had her lie on top of him and she felt something around her "stomach/private area." Roxanne testified they both were wearing underwear. Deirdre described multiple incidents, including Cooley forcing her to perform

fellatio on him when she was about six years old. In both instances, the trial court found the evidence adequate to permit the jury to find beyond a reasonable doubt that Cooley had committed the separate offenses in question, namely, indecency with a child by contact and aggravated sexual assault of a child under fourteen and indecency with a child.

After both Roxanne and Deidre testified on direct examination, the trial court instructed the jury not to consider evidence of Cooley's other "crimes, wrongs or acts[]" unless the jury found and believed

> beyond a reasonable doubt that [Cooley] committed such other crimes, offenses, wrongs or acts, if any were committed, and even then, you may only consider the same in determining the motive, plan, opportunity, intent, preparation, knowledge, identity, absence of mistake or accident of [Cooley], if any, in connection with the other offenses, crimes[,] wrongs or acts, if any, alleged against him in the indictment in this case or as to the relationship of the parties and for no other purpose.

Cooley's Motion for New Trial

In addition to re-urging previous arguments addressing the admissibility of evidence, Cooley's Motion for New Trial includes two affidavits: one from Cooley's trial attorney, Brian Burns, and one from psychologist Matthew Ferrara.

Burns's affidavit states that according to courtroom observers, Juror 63 appeared friendly to the defense. Specifically, Burns states that Juror 63

> appeared disinterested and at times dubious of key prosecution witness testimony. In addition, Juror 63 was described as having slept through direct examination of two state witnesses. Conversely, Juror 63 was

described to be interested and engaged in the cross examination of the same prosecution witnesses. Finally, Juror 63 was described as appearing markedly dubious of the testimony of the Complainant.

Ferrara's affidavit focuses on factors tending to diminish the credibility of the three victims who testified about Cooley's abuse. Ferrara expressly addressed false outcries of sexual abuse and the relationship between memory and the passage of time. In his opinion,

> Had defense counsel called a mental health expert to testify during the guilt-innocence phase of Mr. Cooley's trial, the expert could have testified about the degradation of memory over the decades. This testimony could have been used by one or more of the jurors to reach a not guilty verdict.

Ferrara then cites to studies supporting his conclusion about the inaccuracy of witnesses' memories.

## ANALYSIS

Point of Error One: Juror Excuse

In his first point, Cooley argues that the trial court erred in finding Juror 63 disabled and excusing her for that reason. In support of his position, Cooley contends that the trial court's decision was premature, since the court excused Juror 63 without knowing whether the juror's sick child might be better after the weekend, thus enabling Juror 63 to continue her service on the jury. Cooley further contends that "[t]he trial court's decision was unreasonable because there was no evidence concerning the extent of the juror's child['s] illness prior to the juror being

58

discharged or whether the child's illness would impact the proceeding after the weekend."

The Texas Code of Criminal Procedure governs a trial court's action if a juror dies or becomes disabled during the trial, stating:

> Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman. Except as provided in Subsection (b), however, after the trial of any felony case begins and a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict; but when the verdict shall be rendered by less than the whole number, it shall be signed by every member of the jury concurring in it.

Tex. Code Crim. Proc. Ann. art. 36.29(a).

In this context, "disabled" is construed as suffering from a "'physical illness, mental condition, or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror,' or that the juror was suffering from a condition that inhibited him from 'fully and fairly performing the functions of a juror.'" *Scales v. State*, 380 S.W.3d 780, 783 (Tex. Crim. App. 2012) (citations omitted).

We review the trial court's dismissal of Juror 63 under an abuse of discretion standard. *See Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003) ("The determination as to whether a juror is disabled is within the discretion of the trial court, and absent an abuse of that discretion, no reversible error will be found.");

*Allen v. State*, 867 S.W.2d 427, 429 (Tex. App.—Beaumont 1993, no pet.) (same). A trial court abuses its discretion in dismissing a juror if its decision is arbitrary or unreasonable; we will uphold the trial court's ruling if it falls within the scope of reasonable disagreement. *See Scales*, 380 S.W.3d at 784 (citation omitted) (defining an abuse of discretion). "A trial judge abuses his discretion when no reasonable view of the record could support his ruling." *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) (citation omitted). We do not substitute our judgment for that of the trial court, but instead assess whether the ruling was arbitrary or unreasonable when viewing the evidence in the light most favorable to the ruling. *See Scales*, 380 S.W.3d at 784 (citation omitted).

Applying the above definition of "disabled" to Juror 63, the trial court found that Juror 63 was disabled on the dual grounds that she had both an emotional and mental state that caused her to worry over her sick child and her ability to pick up the child on time. According to the trial court, Juror 63 "certainly was distraught[]" and was "unable to concentrate" late in the day due to her concern about picking the child up before his after-school facility closed. The trial judge then found that Juror 63's concern over caring for her child prevented her from discharging her responsibility as a juror, rendering her disabled within the meaning of the statute and the case law interpreting it.

Cooley argues the trial court's decision to excuse Juror 63 was "premature," but he has cited no authority requiring a trial court to wait to see whether the situation improves, and we are aware of none. To the contrary, many authorities have approved excusing a juror whose disability was likely temporary. In *Routier*, for example, the trial court excused an ill juror over the appellant's objection, even though the court apparently had no information about how long the juror's illness would last. 112 S.W.3d at 586, 588. Similarly, in *Romero v. State*, our sister court held that the trial court did not abuse its discretion in discharging a juror experiencing physical symptoms resulting from the stress of jury service. 396 S.W.3d 136, 140–45 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The *Romero* court held that "[t]he trial court also does not abuse its discretion in discharging a juror as disabled notwithstanding the temporary nature of the physical illness." *Id.* at 143–44. Therefore, even if Juror 63's child might have been better after the weekend, the trial court did not err in excusing Juror 63 when the child's illness was first reported.

We previously considered and rejected an argument similar to Cooley's in *Moffett v. State*, 949 S.W.2d 778, 783 (Tex. App.—Beaumont 1997, pet. ref'd). In *Moffett*, the trial court dismissed a juror who was "'obviously very upset[]'" over family problems such that she "could not concentrate on the trial in order to render a fair and impartial verdict." *Id*. We overruled the appellant's contention that the trial

61

court abused its discretion in excusing the juror, finding no abuse of discretion and consequently no error. *See id*.

Nothing in the record suggests that the trial court excused Juror 63 for an impermissible reason, such as the juror's view of the evidence, as apparently was the case in *Scales*. *See* 380 S.W.3d at 786. In fact, defense counsel stated in his affidavit in support of his motion for new trial that he had noticed Juror 63 apparently sleeping through some of the testimony. These circumstances fall within the trial court's exercise of discretion. We overrule Cooley's first point on appeal.

Points of Error Two and Three: Terri's and Javier's Testimony

In his second and third points of error, Cooley argues that the trial court erred in excluding the challenged portions of Terri's and Javier's testimony, since this testimony purportedly was relevant to Mother's alleged history of making false allegations. Cooley bases his argument on (1) the Sixth Amendment and *Hammer v. State*, and (2) Rule 613(b) of the Texas Rules of Evidence. *See* U.S. CONST. amend. VI; 296 S.W.3d 555, 561 (Tex. Crim. App. 2009); Tex. R. Evid. 613(b).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Johnson v. State*, 433 S.W.3d 546, 555–58 (Tex. Crim. App. 2014) (affirming the exclusion of evidence). It is only when the trial court's ruling falls outside the zone of reasonable disagreement that the court abuses its discretion. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024). Unless the trial court has

clearly abused its discretion, we will not disturb its ruling. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)). The trial court does not abuse its discretion by excluding "extrinsic evidence to impeach a witness on a collateral issue." *Hayden v. State*, 296 S.W.3d 549, 554–55 (Tex. Crim. App. 2009) (citations omitted); *see Booker v. State*, 929 S.W.2d 57, 66 (Tex. App.—Beaumont 1996, pet. ref'd) ("[A] witness may not be impeached on a collateral matter which the cross-examining party would not be entitled to prove as part of his case.") (citation omitted).

The Sixth Amendment and *Hammer v. State*

Cooley contends that the trial court's exclusion of Terri's and Javier's testimony hampered his Sixth Amendment right to impeach Mother.[5] The State responds that the excluded testimony constituted improper collateral impeachment. As set forth above, the trial court allowed Cooley to elicit testimony from Terri and Javier as to Mother's truthfulness, but did not permit testimony about her alleged obstruction of visitation rights to her older daughter, Erika, Eva's half-sister.

The Sixth Amendment grants a criminal defendant the right "to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. The Confrontation Clause includes the right to cross-examine witnesses to reveal "'possible biases,

---

[5] Although Cooley used the term "cross-examine," the context indicates that he intended to impeach her.

prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.'" *See Balderas v. State*, 517 S.W.3d 756, 775 (Tex. Crim. App. 2016) (citation omitted). Cooley relies on *Hammer v. State* for the proposition that the Sixth Amendment's confrontation clause permits cross-examining a witness "to attack their general credibility or to show their possible bias, self-interest, or motives in testifying." 296 S.W.3d at 561; *see* U.S. CONST. amend. VI. Cooley contends that the Sixth Amendment, as applied in *Hammer*, required the trial court to admit Terri's and Javier's testimony to discredit Mother. In fact, Cooley argues that Mother's conduct in the present instance was "identical" to her prior conduct that Terri and Javier would have described for the jury had the trial court permitted their testimony.

*Hammer* cautions, however, that a defendant does not have "an absolute constitutional right to impeach the general credibility of a witness in any fashion that he chooses." *See Hammer*, 296 S.W.3d at 562. In *Hammer,* the defendant was accused of indecency with a child. *See id.* at 557. The defendant's attorney sought to cross-examine the complaining witness about her own previous allegations of sexual assault against different individuals, but the trial court excluded the evidence. *See id.* at 559–60. The San Antonio Court of Appeals affirmed the trial court and on petition for discretionary review the Court of Criminal Appeals found that the trial judge abused her discretion in excluding some of the evidence appellant offered to

64

demonstrate the complainant's motive to falsely accuse the appellant of molestation. *Id.* at 558. Here, Cooley was attempting to discredit Mother, and not the complainant, and Cooley's impeachment evidence concerned Mother's allegations against her former husband and his family regarding a different child.

Cooley contends that excluding Terri's and Javier's testimony violated "his Sixth Amendment right to confront and cross-examine his accusers." He posits that he was denied the right "to establish [Mother's] bias and motive for creating false allegations of abuse." Although an attorney may cross-examine a witness to show the witness's bias and motive, he cannot do so without establishing "'a causal connection or logical relationship between'" the disallowed cross-examination and the witness's alleged bias. *See Johnson*, 433 S.W.3d at 552 ("[A] defendant who cannot persuasively establish this connection has essentially failed to demonstrate that the evidence he seeks to introduce . . . is *relevant* to prove the allegation of bias.") (citation omitted). In *Johnson*, the Court of Criminal Appeals emphasized that there must be a causal connection which is "ultimately rooted in the concept of relevance," when examining whether an accused is entitled to use the purported impeachment evidence. *Id.* at 552. In *Johnson*, the defense sought to cross-examine the witnesses regarding charges pending against them or bias based on an expectation of a deal from the prosecution. *Id.* at 554. That said, even if the alleged impeachment evidence is relevant, the trial court's discretion does not end there, and

the trial court, especially with respect to a Confrontation Clause challenge, retains a "wide latitude" which is exceeded only "when the trial court exercises its discretion to so drastically curtail the defendant's cross-examination as to leave him 'unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.'" *Id.* at 555. Ultimately, the Court affirmed the trial court's decision preventing the defendant from cross-examining two witnesses about the details of their pending felony charges, holding that the defendant "failed to demonstrate the relevancy of the proffered evidence[.]" *Id.* at 558.

Here, the defendant wanted to call two additional witnesses, neither of which were a complainant or victim in this case, to testify that Mother had made prior allegations against her former husband and in-laws, which according to the defendant somehow impeached Eva's testimony because it showed Mother made similar allegations against others pertaining to her older daughter several years earlier. Based on the record before us, we cannot say the trial court abused its discretion in excluding the proffered testimony. The trial court reasonably could have concluded the appellant failed to demonstrate the relevancy of the proffered impeachment evidence and that the testimony would have a tendency to confuse the jury. *Id.* Additionally, even if appellant had shown the relevancy of the evidence, appellant failed to show that "[a] reasonable jury might have received a significantly

different impression of" either witness's "credibility had…counsel been permitted" to elicit that evidence. *Id.* at 558. (citing *Del. v. Van Arsdall*, 475 U.S. 673, 680 (1986) (It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.).

Rule 613(b)

Cooley also argues that Rule 613(b) of the Texas Rules of Evidence rendered Terri's and Javier's testimony admissible. Tex. R. Evid. 613(b). Rule 613(b) requires that the witness be apprised of the contents of the statement, time and place of the statement, and the person to whom the statement was made; in addition, it requires the witness be given the opportunity to explain or deny the statement or circumstances; and finally, it requires that extrinsic evidence is not admissible to show the bias unless the witness fails to unequivocally admit it. *Id*.

In *Dixon v. State*, the court noted that a party may use specific instances of conduct to show a witness's bias or interest. 2 S.W.3d 263, 271 (Tex. Crim. App. 1999). The court explained how Rule 613(b) would apply in a hypothetical situation:

67

Under Rule [613(b)],[6] we still follow 'Queen Caroline's Rule.' That is, in Texas we are still gentlemen and require the cross-examiner to ask the witness about the facts which might give rise to the motive or bias. We must ask the Pope, 'Isn't it true that the defendant is your mother, bodyguard, banker or favorite Archbishop?' But that is all. It gives him an opportunity to deny, admit, or explain the factual basis for his possible bias. If the potential bias concerns a specific event or prior statements the witness has made, then we must also tell him where and when, and, if a statement, to whom the statement was made.

*Id.* at 273.

Both at trial and on appeal, Cooley argues that Terri's and Javier's testimony about Mother was admissible under Rule 613(b). As the trial court and the *Dixon* court observed, however, "if you examine a witness about a statement, whether oral or written, to prove that the witness' bias or interest, a party must tell the witness the contents of the statement, time and place of the statement and the person to whom the statement was made." *See id.* ("If the potential bias concerns a specific event or prior statements the witness has made, then we must also tell him where and when, and, if a statement, to whom the statement was made."). Cooley's counsel asked Mother (1) whether she had prevented her former husband from visiting Erika; (2) whether she had threatened to call CPS regarding custody or visitation matter; and (3) whether she had accused her former mother-in-law of assaulting her. When asking these questions, Cooley's counsel did not include the information required

---

[6] In 1999, when *Dixon v. State* was decided, the applicable rule was Rule 612(b). That Rule has since been renumbered. *See* Tex. R. Evid. 613(b).

by the cited rule, namely, the who, what, when, and where. *See* Tex. R. Evid. 613(b). He therefore did not comply with Rule 613(b) or *Dixon.* Accordingly, the trial court did not abuse its discretion by excluding Terri's and Javier's testimony. *See* Tex. R. Evid. 613(b); *Dixon*, 2 S.W.3d at 273.

We overrule points of error two and three.

Points of Error Four and Five: Roxanne's and Deirdre's Testimony

In his final two points, Cooley argues the trial court abused its discretion in admitting Roxanne's and Deirdre's testimony, arguing that the trial court failed to comply with Texas Code of Criminal Procedure art. 38.37 and the acts alleged were too remote in time.

We review the trial court's ruling admitting extraneous offense testimony for an abuse of discretion. *See Lambeth v. State*, 523 S.W.3d 244, 249–50 (Tex. App.— Beaumont 2017, no pet.) (we apply an abuse of discretion standard to a trial court's decision regarding admission of extraneous offense testimony). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *See Montgomery*, 810 S.W.2d at 380; and see Sections 2 and 2-a of the Texas Code of Criminal Procedure provide the rules regarding the admissibility of extraneous offense evidence in a trial for, among other things, continuous sexual abuse of a young child. *See* Tex. Code Crim. Proc. Ann. art. 38.37 § 2(a)(1)(B), (b), 2-a. These statutory sections state:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to Section 2-a, evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2) may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

Tex. Code Crim. Proc. Ann. art. 38.37 § 2(b).

Before the trial court can admit such evidence, however, it must conduct a hearing outside the jury's presence, to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt[.]" *Id.* § 2-a. The record reflects that the trial court conducted such hearings as to both Roxanne's and Deirdre's testimony. After listening to Roxanne's and Deirdre's descriptions of Cooley's abuse, set forth above, the trial court found that this evidence was "adequate to support a finding by the jury that the defendant committed the separate offense[s]" of aggravated sexual assault of a child under fourteen and indecency with a child beyond a reasonable doubt. The general rule is that the testimony of an eyewitness alone is sufficient to support a defendant's conviction. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971). Both Roxanne and Deirdre gave eyewitness testimony claiming Cooley made sexual contact with them. By conducting these hearings and finding the proffered testimony sufficient to support a jury finding that Cooley committed the extraneous acts beyond a reasonable doubt,

the trial court complied with article 38.37. *See* Tex. Code Crim. Proc. Ann. art. 38.37 §§ 2(a)(1)(B), (b), 2-a; *see also Guevara v. State*, 667 S.W.3d 422, 438–43 (Tex. App.—Beaumont 2023, pet. ref'd) (holding that there was no error in admitting evidence of the defendant's other crimes under Article 38.37 of the Texas Code of Criminal Procedure).

In *Guevara*, as in this case, the trial court admitted evidence of the defendant's extraneous offenses under Article 38.37 of the Code of Criminal Procedure. *See Guevara*, 667 S.W.3d at 438. In his appeal, Guevara argued that the trial court abused its discretion in admitting the testimony of his previous alleged victims "because their testimony was not adequate to support a finding by the jury that" he committed the extraneous offenses alleged and because one of the alleged offenses took place more than thirty years earlier. *Id.* at 438. We affirmed his conviction, holding that the trial court did not abuse its discretion in allowing the testimony. *Id.* at 442.

On appeal, Cooley contends that Roxanne's and Deirdre's testimony was inadmissible since the probative value of their testimony was "lessened" by the "extreme remoteness" of Cooley's alleged crimes against them and because Cooley's alleged acts were not similar as to all three of his victims. To support his argument, he relies on Rule 403 of the Texas Rules of Evidence, which permits the trial court to "exclude relevant evidence if its probative value is substantially

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

In undertaking a Rule 403 analysis, the trial court must balance the probative force of the evidence and the State's need for it against (1) unfair prejudice; (2) confusion of the issues; (3) misleading the jury; and (4) undue delay and needless presentation of cumulative evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006). In Cooley's case, we conclude the State had a need to present the similar acts evidence to corroborate Eva's testimony because of the "he said she said" nature of the evidence. In addition, there was no unfair prejudice because it was not inflammatory and it related directly to the charge at issue, actually helped to clarify the evidence for the jury—rather than confuse the jury, focused the jury on Cooley's behaviors—rather than mislead the jury, and it did not cause undue delay through the needless presentation of cumulative evidence. *Id.* We do not agree that the admission of this evidence unfairly prejudiced Cooley, but instead this evidence was probative to show that Cooley's character has not changed since he was a teenager, as expressly permitted by Article 38.37. *See* Tex. Code Crim. Proc. Ann. art. 38.37 § 2(b).

We overrule Cooley's fourth and fifth points of error.

# CONCLUSION

Having determined that the trial court did not abuse its discretion by releasing Juror No. 63, by excluding portions of Terri's and Javier's testimony, or by admitting Roxanne's and Deirdre's testimony of Cooley's extraneous offenses, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on February 6, 2025
Opinion Delivered May 21, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.